# MATTER OF R-

## In Exclusion Proceedings

### A-70105328

*Decided by Board December 15, 1992*

(1) The fact that a Sikh from the state of Punjab in India was beaten and threatened by Sikh militants because he resisted their recruitment efforts did not establish persecution on account of political opinion or any of the other grounds enumerated in the Immigration and Nationality Act.

(2) The mistreatment of a Sikh in Punjab by Indian police in the course of an investigation does not establish eligibility for asylum or withholding of exclusion and deportation where the purpose of the mistreatment was to obtain information about Sikh militants who sought the violent overthrow of the Indian Government rather than to punish him because of his political opinions or merely because he was a Sikh.

(3) While the Sikh applicant for asylum may fear returning to Punjab because of the mistreatment he experienced there at the hands of the Indian police, he has not demonstrated country-wide persecution or mistreatment of Sikhs by the central government or other Indian groups, and therefore he has not established a well-founded fear of persecution *in India.*

(4) Absent a threat of persecution on a country-wide basis in India and in light of the factual circumstances of his case, a Sikh applicant does not merit a grant of asylum in the exercise of discretion even if it were assumed that he suffered past persecution in Punjab.

EXCLUDABLE: Act of 1952—Sec. 212(a)(5)(A)(i) [8 U.S.C. § 1182(a)(5)(A)(i)]—No valid labor certification

Sec. 212(a)(6)(C) [8 U.S.C. § 1182(a)(6)(C)]—Fraud or willful misrepresentation of a material fact

Sec. 212(a)(7)(A)(i)(I) [8 U.S.C. § 1182(a)(7)(A)(i)(I)]— No valid immigrant visa

ON BEHALF OF APPLICANT: Chanan Weinstein, Esquire
c/o Legal Eagles Consulting Services
One World Trade Center, Suite 1580
Long Beach, California 90831

BY: Milhollan, Chairman; Morris and Vacca, Board Members. Concurring and Dissenting Opinion: Dunne, Board Member. Concurring Opinion: Heilman, Board Member.

In a decision rendered on January 31, 1992, the immigration judge

found the applicant excludable pursuant to sections 212(a)(5)(A)(i) and (7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(5)(A)(i) and (7)(A)(i)(I) (Supp. III 1991), denied his applications for asylum under section 208(a) of the Act, 8 U.S.C. § 1158(a) (1988), and for withholding of exclusion and deportation under section 243(h)(1) of the Act, 8 U.S.C. § 1253(h)(1) (Supp. II 1990), and ordered him excluded and deported from the United States. The applicant, through counsel, has appealed from the denial of his request for asylum and withholding. The appeal will be dismissed. The applicant's request for oral argument before the Board is denied. *See* 8 C.F.R. § 3.1(e) (1992).

The record reflects that the applicant is a 21-year-old native and citizen of India, who raised a claim of past persecution, as well as a fear of future persecution in that country, on account of his religion and his actual or imputed political opinions. In particular, the applicant related that he was a Sikh from the Punjab region of India. He indicated that in January 1991, Sikh militants, apparently members of the All India Sikh Student Federation, came to his family home and demanded money to support their cause. In addition, the applicant stated that the militants sought to recruit him, although he rebuffed their efforts. He explained that while he favored an independent Sikh state, he rejected accomplishing this goal by violence. He also indicated that he did not want to cause problems for his father.

According to the applicant, his contact with these Sikhs was reported to the local police, who arrested him as a suspected militant. He testified that he was interrogated about the individuals who visited his house and subjected to brutal physical abuse by the police because they suspected him of being one of the militant Sikhs. The police ultimately released him without charging him or taking him before a judge after "good people in the area" went to the police station. He stated that upon his release, he returned to his family home, where he was again confronted by the Sikh militants. He testified that they beat him and told him that he must join their ranks. The applicant related that the militants threatened to kill him and a member of his family if he did not comply with their wishes. He indicated that, thereafter, both the police and the militants continued to seek him out. At one point during his testimony, the applicant stated that he was also beaten by the police on June 13, 1991, but the reasons or circumstances of this incident were not made clear. His testimony suggested that this beating occurred after another of his encounters with the militant Sikhs (whom the applicant referred to as "the boys"). He testified that, as a result, he went into hiding in June 1991 and departed India in September 1991. He indicated that he did not want to return to India because he feared the police and the militant Sikhs. He stated that the "Punjab

police" are "very dirty" police who bring fake charges and kill people in false encounters.

The immigration judge concluded that the applicant had not established his eligibility for either asylum or withholding of exclusion and deportation and the applicant appealed. On appeal, it is submitted that the applicant

> proved in his testimony and the supporting documents that if the court will not withhold his deportation his life will be in danger. There is a clear probability and/or it is more likely than not that the authorities will continue to persecute him due to his alleged ties to the militants. The militants will continue to harass him and perhaps kill him due to his refusal to join them.

Upon our independent review of the record, we conclude that the applicant has failed to demonstrate either past persecution or a well-founded fear of future persecution in India on account of race, religion, nationality, membership in a particular social group, or political opinion.[1] *See* sections 101(a)(42)(A), 208(a) of the Act, 8 U.S.C. §§ 1101(a)(42)(A), 1158(a) (1988); 8 C.F.R. § 208.13 (1992); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (holding that the asylum standard is more generous than the withholding standard); *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989) (past persecution); 8 C.F.R. § 208.13(b)(2) (1992) ("reasonable possibility" definition of well-founded fear asylum standard). Further, we find that the applicant has failed to establish his eligibility for withholding under the "clear probability" of persecution standard. *INS v. Stevic*, 467 U.S. 407 (1984); *see also* section 243(h)(1) of the Act; 8 C.F.R. § 208.16 (1992).

As a primary matter, we find that there is no persuasive evidence in the record to demonstrate that either the Sikh militants or the police who confronted the applicant sought to punish him on account of one of the grounds enumerated in the Act. As regards persecution on account of political opinion, we note the Supreme Court recently made clear in *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992), that persecution must be on account of the *victim's* political opinion, not the persecutor's. The Court further held that an applicant for asylum must establish that the persecution or feared persecution is *because* of that political opinion, rather than a refusal to fight for a guerrilla group. *Id.* Here, the record indicates that the Sikh militants were seeking operating resources from the applicant in the form of material

---

[1] We have assumed, arguendo, that the applicant's testimony is worthy of belief. We note, however, that he made no reference at all to the incidents regarding the "militant" Sikhs on his application for asylum and specifically indicated on the application that he had never been detained or interrogated in any country other than the United States. We also note that the record does not support the assertion in the applicant's brief on appeal that he was accused of being a "bad Sikh."

assistance and manpower. The mere fact that the militants also may have had a generalized political agenda is inadequate to establish that the applicant fears persecution from them on account of political opinion. We find no persuasive evidence, direct or circumstantial, that the motives underlying the militants' conduct towards the applicant were tied to the applicant's actual or imputed political opinions, rather than to his refusal to assist them. In this regard, we note that the mere resistance of forced recruitment is not an "expression of political opinion hostile to the persecutor." *Id.* Here, in resisting recruitment, the applicant indicated that he told the militants that his father was an honest person and that "they" (apparently meaning the applicant and his father) believed in creating an independent Sikh state, but not through violent means.[2] He stated that it was dangerous to tell the militants this because they had killed certain people who refused to join them. The militants then demanded money from the applicant's family and still wanted him to join their group. On another occasion, the militants returned and threatened to kill him and a family member if he would not join their cause. He testified that he was beaten by the militants on this occasion and told that he would not be beaten if he would join them. While the circumstances the applicant found himself in were terrible, there is no indication that the militants cared at all about the reasons for his refusal to join. They certainly did not cease to be interested in having him join their group because of his views. In fact, all of the evidence reflects (and the applicant seems to largely acknowledge on appeal) that the purpose of the threats and mistreatment by the militants was to coerce him into joining with them. The Supreme Court has held that persecution for this reason is not "because" of political opinion. *Id.* at 816.

Similarly, there is no indication that the police actions against the applicant extended beyond the investigation of and reaction against those thought—rightly or wrongly—to be militants seeking the violent overthrow of the government. Under the circumstances of this case, the police had reasons to investigate the extent of the applicant's knowledge of and involvement with Sikh militants. While the applicant states he was subjected to police brutality, which we certainly do not countenance, the record reflects that the purpose of the mistreatment was to extract information about Sikh militants, rather than to persecute the applicant "because" of his political opinions or the mere

---

[2] The applicant did not make it entirely clear what he specifically said to the militants. He testified that he told them that he could not join them because his father was a "very honest person" and because "we don't believe in this" (presumably meaning the use of violence).

fact that he was a Sikh.[3] Accordingly, the applicant has not established his eligibility for either asylum or withholding of exclusion and deportation. *Id.*

Moreover, we do not find adequate evidence to demonstrate that the alleged persecution in this case exists on a country-wide basis. To establish eligibility for relief under section 208(a) of the Act, an alien must be unable or unwilling to return to his country of nationality or the country in which he last resided because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Inherent in refugee status is the concept that an individual requires international protection because his country of origin or of habitual residence is no longer safe for him. This concept is expressed in part by the requirement in the Act and the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"), that a refugee must be unable or unwilling to return to a particular "country." *See* section 101(a)(42)(A) of the Act; *see also* Article 1.2 of the Protocol, which largely incorporates the definition of refugee contained in Article 1A(2) of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Convention"). Similarly, the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 90, at 21 (Geneva, 1988) ("*Handbook*") provides: "As long as [an applicant] has no fear in relation to the country of his nationality, he can be expected to avail himself of that country's protection. He is not in need of international protection and is therefore not a refugee."

We have construed this requirement "to mean that an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country—he must show that the threat of persecution exists for him country-wide." *Matter of Acosta*, 19 I&N Dec. 211, 235 (BIA 1985), *modified on other grounds, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The published cases which have dealt with this issue have

---

[3] We certainly do not hold that there are no circumstances under which the motive for police abuses could be to persecute someone on account of a reason protected under the Act, but we find no direct or circumstantial evidence that such is the case here. There is no evidence that the police were concerned with anything other than the fact the applicant was thought to be involved with those engaged in a violent struggle against the government. There is nothing to indicate that, such being the case, the police cared what the applicant's individual political opinions may or may not have been or whether he was or was not a Sikh.

involved claims of nongovernmental persecution. *See, e.g., Etugh v. INS*, 921 F.2d 36, 38-39 (3d Cir. 1990); *Cuadras v. INS*, 910 F.2d 567, 571 (9th Cir. 1990); *Quintanilla-Ticas v. INS*, 783 F.2d 955, 957 (9th Cir. 1986); *Diaz-Escobar v. INS*, 782 F.2d 1488, 1493 (9th Cir. 1986); *Matter of Fuentes*, 19 I&N Dec. 658, 662-63 (BIA 1988). While the issue will ordinarily arise in these circumstances, it is not limited to such situations. The issue similarly can arise where governmental authorities or those with ties to the government cannot be adequately controlled in one particular area of a country, but individuals can live safely elsewhere in their country of nationality. The *Handbook* states:

> The fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality. Thus in ethnic clashes or in cases of grave disturbances involving civil war conditions, persecution of a specific ethnic or national group may occur in only one part of the country. In such situations, a person will not be excluded from refugee status merely because he could have sought refuge in another part of the same country, *if under all the circumstances it would not have been reasonable to expect him to do so.*

*Handbook, supra,* para. 91, at 21-22 (second emphasis added).

This language reflects the concept that, while it is not "always" necessary to demonstrate a country-wide fear, it is the exception, rather than the rule, that one can qualify as a refugee without such a showing.

In the instant case, the applicant's claim is focused on the state of Punjab and the violence and police abuses there. The discord in Punjab is well known. As the advisory opinion from the Department of State's Bureau of Human Rights and Humanitarian Affairs ("BHRHA") relates, the "[e]thnic strife and separatist violence in the state of Punjab has been one of India's intractable problems."[4] However, Punjab is but one of 25 states in India, and, as the BHRHA also notes, India is "a democratic nation with strong legal safeguards for individuals, a free press, an independent judiciary, and active civil liberties organizations." The advisory opinion states that the Government of India "does not take action against individuals solely as a result of their being members of the Sikh faith," and that large numbers of Sikhs lead "tranquil and productive lives in other parts of India."

---

[4] While the letter of the Department of State is advisory in nature, that agency is charged, inter alia, with the responsibility of knowing what is going on, politically and otherwise, in foreign countries. In the instant case, the Department of State had the opportunity to examine and evaluate the applicant's evidence. In view of the Department of State's knowledge of the country in question, its opinion in this case is worthy of serious consideration in the absence of facts to the contrary. *See generally, Rojas v. INS*, 937 F.2d 186, 190 n.1 (5th Cir. 1991); *Asghari v. INS*, 396 F.2d 391, 392 (9th Cir. 1968).

We do not find that the applicant has adequately addressed the issues raised by this aspect of the BHRHA opinion. The record indicates that the situation relating to Sikh grievances is peculiar to Punjab, a geographically small portion of India with its own unique history. There is no evidence that similar conditions, or violent political struggles relating to Sikhs, pertain in any other part of India. There is simply no evidence in this record that the applicant could not safely live in India, other than in Punjab, or that it would not be "reasonable to expect him to do so." *Handbook, supra,* para. 91, at 22. Particularly given the scrutiny under which India is examined by human rights organizations, if there were country-wide persecution or mistreatment of Sikhs by government authorities in India, we would expect there to be corroborative background evidence. *See Matter of Dass,* 20 I&N Dec. 120 (BIA 1989).

Therefore, even assuming that the applicant may fear returning to Punjab, we do not find that he has demonstrated either a well-founded fear or a clear probability of persecution *in India. See* sections 101(a)(42)(A), 208(a), 243(h)(1) of the Act; 8 C.F.R. §§ 208.13, 208.16 (1992); *INS v. Cardoza-Fonseca, supra; INS v. Stevic, supra.* Assuming, arguendo, that he previously suffered persecution in Punjab, on the evidence of record before us, we do not find it unreasonable to expect him to have sought refuge elsewhere in India. In view of the unrebutted opinion of the Department of State, which has been characterized as the "best resource the Board could look to in order to obtain information on political situations in foreign nations," we find that a preponderance of the evidence establishes that conditions in India, outside Punjab, are not such that the applicant would have a well-founded fear of returning to that country. *Rojas v. INS,* 937 F.2d 186, 190 n.1 (5th Cir. 1991); *see also* 8 C.F.R. § 208.13(b)(1)(i) (1992). In view of the absence of evidence of any likelihood of persecution elsewhere in India and the factual circumstances of this case, we would deny his application for asylum in the exercise of discretion. *Matter of Chen, supra.* We recognize that it is always unfortunate when persons are obliged to leave their homes as a result of danger or fear, but that is not the issue here. The question is, once the decision to leave one's home has been made, does an individual have the right to emigrate rather than move elsewhere in his own country.

For the reasons stated above, the appeal will be dismissed.

**ORDER:** The appeal is dismissed.

*CONCURRING IN PART AND DISSENTING IN PART:*
Mary Maguire Dunne, Board Member

I respectfully concur in part and dissent in part.

627

In its decision, the majority dismisses the applicant's appeal from the immigration judge's denial of asylum and withholding of exclusion and deportation. As noted by the majority, the record reflects that the applicant is a Sikh from the Punjab region of India, who raised a claim of past persecution, as well as a fear of future persecution, on account of his religion and his actual or imputed political opinions. The majority's factual summary of the applicant's persecution claim, which I adopt, shows that he was abused by Sikh militants, apparently members of the All India Sikh Student Federation, who sought to recruit him into their ranks and to force him to contribute material assistance to their cause. Although the applicant favored the creation of an independent Sikh state, he refused to join the militants, as he rejected their use of violence.

The majority also notes that the applicant's contact with the militants was reported to the Indian police and that, consequently, he was arrested as a suspected subversive. The majority summarily acknowledges that the applicant was subjected to "brutal physical abuse" by the police. I would add that the specific torture endured by the applicant included having his arms and legs stretched, being stripped and whipped with a leather belt, being beaten with batons, and being denied food.

Turning to an analysis of the applicant's persecution claim, I concur with the majority's view that the decision of the United States Supreme Court in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), controls that aspect of his claim dealing with the Sikh militants. That decision specifically found that forced recruitment by a rebel faction per se does not amount to persecution within the meaning of the Immigration and Nationality Act. *Id.* I strongly disagree, however, with the majority's position that the abuse meted out to the applicant by the Indian police was not on account of religion and/or political opinion. I also reject the majority's alternate holding that the applicant's claim with respect to the Indian police should be denied because he has not shown a well-founded fear of persecution on a country-wide basis.

In regard to the underlying merits of the applicant's persecution claim concerning the Indian police, the majority finds that "the purpose of the mistreatment was to extract information about Sikh militants, rather than to persecute the applicant 'because' of his political opinions or the mere fact that he was a Sikh." In arriving at this conclusion, the majority has ignored relevant precedent of the United States Court of Appeals for the Ninth Circuit. As this case arises within the jurisdiction of that court, we are bound by its decisions. *See Matter of Anselmo*, 20 I&N Dec. 25, at 31 (BIA 1989). Specifically, the Ninth Circuit has ruled that while a government has the right to prosecute individuals accused of criminal activity, such as

supporting a guerrilla faction, when violence or threats of violence usurp legal procedure, then persecution on the basis of political opinion exists. *See, e.g., Blanco-Lopez v. INS,* 858 F.2d 531, 534 (9th Cir. 1988).

In addition, the majority has ignored the principle enunciated in the Board's own precedent of *Matter of Fuentes,* 19 I&N Dec. 658, 662 (BIA 1988), that an alien does not bear the unreasonable burden of establishing the exact motivation of a persecutor where different grounds for actions are possible. In this light, I find improper the majority's confident conclusion that the persecution suffered by the applicant at the hands of the Indian police was not premised upon one of the protected grounds.

In reality, the majority employs a standard diametrically opposed to that set forth in *Matter of Fuentes, supra,* by implicitly suggesting that an alien must prove a persecutorial motivation anchored upon one of the enumerated grounds *to the exclusion of all other possible motivations. Matter of Fuentes,* however, recognized that there can be more than one possible basis for a persecutor's actions. The task of the alien is simply to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds. Concomitantly, it is irrelevant whether the majority's interpretation of the events is reasonable; the proper focus is whether the applicant's interpretation is reasonable.

Under the facts of this case, it is logical to assume that religious and political considerations[1] *may have been* the critical factors driving the Indian security apparatus to persecute the applicant. *See Singh v. Ilchert,* 801 F. Supp. 313, 318-19 (N.D. Cal. 1992). In this regard, I would point out that the present turmoil in the Punjab region of India is based upon religious as well as political differences, that the organization the applicant was suspected of belonging to, the All India Sikh Student Federation, is a religious/political organization, and that the inhumane conduct experienced by the applicant was disproportionate to any measured government reaction that could be expected as a response to anti-government activity. *See INS v. Elias-Zacarias, supra,* at 483-84 (holding that direct evidence of a persecutor's motive is not required, and that circumstantial evidence may suffice).

For a variety of reasons, I also strongly disagree with the majority's

---

[1] In many instances, the grounds of persecution may overlap. *See* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 67, at 17 (Geneva, 1988); *see also INS v. Cardoza-Fonseca,* 480 U.S. 421, 439 n. 22 (1987) (noting that the *Handbook* provides "significant guidance").

alternate finding that the applicant's persecution claim with respect to the Indian authorities should be denied, as he failed to show a well-founded fear of persecution on a country-wide basis. First, I note that the majority grounds this determination on a statement set forth in the advisory opinion of the Department of State's Bureau of Human Rights and Humanitarian Affairs ("BHRHA") that "large numbers of Sikhs are leading tranquil and productive lives [outside of the Punjab] in other parts of India." Although the BHRHA advisory opinion is physically contained in the record and the immigration judge generally referred to it in his decision, it apparently was never entered into evidence, contrary to regulation. *See* 8 C.F.R. § 208.11(c) (1992). The Act "provides that all evidence which is pertinent to determinations made during deportation [or exclusion] proceedings ... must be adduced in the hearing before the immigration judge." *Matter of Fedorenko*, 19 I&N Dec. 57, 74 (BIA 1984) (footnote omitted).

Second, the *issue* of country-wide persecution was never raised at the hearing below, in the immigration judge's decision, or on appeal. Under these circumstances, the majority's finding that the applicant failed to "adequately address" the question is fundamentally unfair. Clearly, the applicant did not have a meaningful opportunity to respond to the critical aspect of the BHRHA advisory opinion upon which the majority relies. *See* 8 C.F.R. § 208.11(c) (1992); *Matter of Saban*, 18 I&N Dec. 70, 71 (BIA 1981). As a practical matter, this lapse of due process is especially egregious when one considers the fact that this case has been designated as a precedent decision. The Board is basing its finding upon a factual assumption which has not been properly developed.

Third, as noted above, this matter arises within the jurisdiction of the Ninth Circuit and we are bound to follow the precedent of that court. It is highly doubtful that the Ninth Circuit would countenance the use of the principle of country-wide persecution where, as here, an alien has been persecuted by one component of a government's security apparatus, the overall organization of which "would presumably be capable of locating [the alien] in other regions of India." *Singh v. Ilchert, supra*, at 321 (citing to Ninth Circuit precedent); *see also Beltran-Zavala v. INS*, 912 F.2d 1027, 1030 (9th Cir. 1990).

Fourth, I find that the majority's country-wide persecution analysis is premised upon a factual conclusion by the BHRHA which is highly suspect. For example, the BHRHA does not explain whether the "large numbers of Sikhs" who lead "tranquil and productive lives" outside of the Punjab include those who, like the applicant, have previously run afoul of the Indian police. Concomitantly, it fails to mention whether a Sikh's "ability to avoid further persecution by relocating inconspicuously may be limited by his manner of religious dress and his inability

to speak the languages or dialects of other regions of India." *Singh v. Ilchert, supra,* at 321.

Moreover, although the BHRHA purportedly based its opinion on the Department of State's annual *Country Reports on Human Rights Practices,* it fails to comment on highly relevant information set forth in those materials. *See, e.g.,* Committees on Foreign Relations and Foreign Affairs, 102d Cong., 1st Sess., *Country Reports on Human Rights Practices for 1990* 1425 (Joint Comm. Print 1991) ("*Country Reports*"). In particular, the *Country Reports* note that over 3,000 Sikhs were killed during anti-Sikh rioting in New Delhi and elsewhere in India following the 1984 assassination of Indira Gandhi by her Sikh bodyguards. *Id.* at 1426. Furthermore, they reflect that only a small percentage of those charged with instigating or participating in the rioting were actually convicted, and that most of these were found guilty of minor offenses. *Id.* The *Country Reports* also refer to allegations that "the principal instigators of the riots are protected from prosecution by their high political visibility, and that none of those arrested were major figures in the mass killing of Sikhs." *Id.* Additionally, an earlier report indicates that "a large number" of Sikhs fled *from* other parts of India to the Punjab as a result of the riots. Committees on Foreign Relations and Foreign Affairs, 99th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1985* 1221, 1221 (Joint Comm. Print 1986).

As a final concern, I would note that the legal analysis employed by the majority in conjunction with the principle of country-wide persecution is seriously flawed. In the context of a past persecution scenario, the majority concludes that the applicant's failure to establish country-wide persecution mandates that his applications for asylum and withholding be denied. The majority has pointed to no direct statutory or regulatory authority for such a conclusion. On the contrary, pursuant to 8 C.F.R. § 208.13(b)(1)(i) (1992), once past persecution is established, an alien is presumed to have a well-founded fear of future persecution if he were to return to his homeland, and the burden is on the Immigration and Naturalization Service to show otherwise by a preponderance of the evidence.

Therefore, in the matter at hand, the burden is on the Service to disprove the existence of country-wide persecution rather than on the applicant to prove it. *See Singh v. Ilchert, supra,* at 322. A problematic one-sentence reference in a BHRHA opinion is insufficient to meet the Service's burden. *See generally Matter of Dass,* 20 I&N Dec. 120, at 123 (BIA 1989) (concerning the necessity of presenting adequate background documentation). Moreover, even if the Service were to prove that the applicant could safely live in regions of India outside of the Punjab, the applicant still may be granted asylum in the exercise of

discretion if he shows "compelling reasons" for not returning, such as the severity of his past persecution. *See* 8 C.F.R. § 208.13(b)(1)(ii) (1992); *Matter of Chen*, 20 I&N Dec. 16, 17 (BIA 1989).

Accordingly, having carefully reviewed the record and relevant authority, I conclude that the applicant has demonstrated statutory eligibility for asylum.[2] Since I find no basis in the record for an adverse discretionary determination, I would sustain the appeal and grant the application for asylum.

*CONCURRING OPINION:* Michael J. Heilman, Board Member

I respectfully concur.

The dissenting opinion contains a number of statements that should not go unchallenged. First, the statement that the "present turmoil in the Punjab region of India is based upon religious as well as political differences" is completely at odds with the history of India. Punjab, which is a state, not a region, has experienced violence instigated solely by Sikh extremists who have attacked fellow Sikhs, Hindus, and Moslems in furtherance of their plan to establish an independent Sikh state. The dissenting opinion would lead one to believe that the "turmoil" in Punjab resulted from some sort of religious "differences" for which the Hindus and Moslems bear responsibility, and that the Hindus and Moslems first attacked or repressed the Sikhs. This statement has absolutely no basis in fact.

There have been since the early 1980's in Punjab demands by some Sikhs over the sharing of the state capital at Chandigarh with Haryana, and grievances over land disputes and water rights pertaining to the Sutlez-Umana Canal. The Government of India was willing to discuss these issues with Sikh political figures and did so, in a series of negotiations. Unfortunately for all concerned, a small but highly vicious band of extremists had decided that Punjab had to become an independent Sikh state, despite the fact that almost 40 percent of the population is Moslem and Hindu. These extremists armed themselves and began a campaign of terror, which in 1984 led to the infamous battle at the "Golden Temple," the subsequent murder of Prime Minister Gandhi, and anti-Sikh violence in some parts of India. It is Sikh-inspired violence that is the historical context for this claim, not any campaign against the Sikhs led by the government or any other religious group, to which the Sikhs are responding.

The dissenting opinion finds that the Government of India

---

[2] I find it necessary to point out that the separate concurring opinion in this case has misinterpreted various aspects of my legal and factual analysis. In lieu of a direct reply, however, I am content to let the careful reader draw his or her own conclusions.

persecutes Sikhs on the basis of religion. The history of India does not disclose any support whatsoever for this view. Sikhs constitute less than 2 percent of the population of India, but have occupied high positions in the Indian Government and military. India is, by terms of its 1976 constitution, a secular state. In 1982, a Sikh, Giani Singh, was elected President of India, and at present another Sikh, Man Singh, is Minister of Finance. It would strike me as quite odd that members of a "persecuted" religious group would be chosen for such high posts. The Nazis did not have a Jewish minister of finance.

I know of no information in this record or from any other source that would support the dissenting member's opinion that the Government of India persecutes Sikhs on account of their religion or is happy to allow others to do so. It is clear to me that there is no historical basis at all for such a view. This asylum claim has no plausible context.

It might be useful in regard to this issue to point out that the violence in Punjab has occurred during a period when many *other* communal and separatist conflicts have occurred, none of which had anything to do with Sikhs. These conflicts led the Indian Government to introduce police and military forces and suspend local governments, as happened in Punjab. In the 1980's and up to the present, there has been agitation or violence in Goa, Assam, Karnataka, Tamil Nadu, Gujarat, Rajasthan, Bihar, Uttar Pradesh, Madhya Pradesh, Kashmir, and West Bengal. Is the fact that Moslems and Hindus and Gurkhas and Nepalese were killed in all of these places evidence that the Government of India persecutes them as well?

The dissenting opinion would have us believe that the anti-Sikh violence that occurred after Prime Minister Gandhi's murder is evidence of religious persecution of Sikhs that shows Sikhs are persecuted all over India. If this is so, then the intermittent violence against Hindus and Moslems and Nepalese and Bengalis in other parts of India shows persecution of those persons as well. As Hindus and Moslems constitute over 90 percent of the population of India, we would have an enormous number of people who could make the same claim of religious persecution, many of them on the basis of attacks by Sikhs. Communal and religious violence is a sad fact of Indian history, beginning with the partition of India and Pakistan. There is no evidence, however, that the Government of India supports or engages in this violence, although the Government has a checkered history in its responses to clashes or attacks by one group against another. But these occurrences show failings on the part of the Government, not any policy of religious persecution.

The dissenting opinion also comes to unsubstantiated conclusions regarding purported mistreatment of the asylum applicant by the police as evidence of persecution on account of religious belief. It is

not clear to me at all why it is assumed that the police in Punjab are not Sikhs, but Hindus or Moslems. There is no evidence in the record to support this assumption. Recent news articles about Punjab have related accounts of the murder of *Sikh* policemen and their families by extremist Sikhs. It would appear that it is convenient for the dissent to assume that the police in Punjab are not Sikhs, or else the religious persecution theory makes no sense. As it is clear that Sikhs are policemen, it would seem elementary to make some inquiry into the percentage of policemen in Punjab who are Sikh, and whether they too mistreat Sikhs who fall into their hands. The proposition that Sikh policemen mistreat Sikhs on account of their common religion is implausible on its face.

As to the dissenting view that mistreatment of Sikhs occurs on account of "political differences," a like number of unfounded assumptions come into play. It is the case in India, as it is in many countries, that the police sometimes exercise their powers in ways that are objectionable. In most instances, beatings and arrests are considered abuses of police authority, not forms of persecution. For instance, the recent beating of Rodney King in Los Angeles was perceived as police misconduct, not persecution of Mr. King. What do we have in India that makes the situation different?

Again, as with religion, it is necessary to look to the underlying context of the claim to determine whether there is a history of persecution of Sikhs in India on account of political opinion. This record shows none. It seems entirely specious to assume that all Sikhs even have the same opinions on political issues of interest to Indian citizens. The only category of Sikhs that appears to have any relevance here is those who have desires relating to the governance of Punjab. Yet we know that Sikhs freely elect persons in Punjab who represent their views on such matters in the state assembly, as well as to the national government, through the medium of Sikh-based political parties. In 1985, in fact, after the battle at the Golden Temple, the Indian Government negotiated a political settlement over a number of issues relating to Sikh demands and established governmental commissions to carry out the agreement. At that time and after, the Government of India has discussed Sikh concerns and negotiated on matters of mutual concern.

So where in the recent history of India is there evidence of "persecution" of Sikhs on account of political opinion, and *what* political opinion? Are we in the realm of fantasy here? Did Hitler negotiate differences with Jews, did Stalin negotiate differences with the "kulaks," did Pol Pot negotiate with his political opposition? There is no history in this record, or outside of it, of the Government of India persecuting Sikhs for peacefully expressing their views

634

through the Indian political process. There is no evidence that while the Government has been negotiating with Sikh moderates for over a decade it has been persecuting them at the same time. So, it appears clear to me that the "political opinion" the dissent alludes to cannot be the political opinion of asserting Sikh views on matters of government.

Let us be clear on what we mean. Who is in danger and for what reason? In my estimation, the category "at risk" is those Sikhs suspected, rightly or wrongly, of being associated with the terrorist Sikh organizations, of providing them assistance. This is an extremely narrow category of persons. The dissenting opinion, I would note, does not define the "political opinion" that it sees being attacked by the police, so that is left purely to conjecture. If the dissent sees the political opinion as being Sikh separatism, then of course, there is no basis for this, as there is no evidence that peaceful expression of this program through the Indian political system places anyone at risk.

Is, however, the "political opinion" envisioned by the dissenting opinion the violent separation of Punjab from India through a program of murder and terrorism, and the creation of a "pure" Sikh state, with Hindus and Moslems to be driven out? If it is, I absolutely reject the notion that this is a form of political opinion protected by the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

Unlike the dissenting opinion, I do not find all political opinion to be equal, or protected under the term "political opinion" as used in the Refugee Act of 1980. I am well aware, of course, that persecution is generally defined as the infliction of harm on account of a "differing" political opinion, one which the supposed agent of persecution finds "offensive." But this is a theory that is surely filled with dangerous pitfalls, if all opinions are treated as equal. If the political program of Sikh extremists includes the murder of policemen and government officials, as well as judges and political figures, is this *not* a program that one should differ with and try to overcome? Surely the opposite is not possible, that one should support it and grant asylum for it.

Violent expression of political opinion was at the heart of a claim that an Irish national wished to make to this Board. The Attorney General refused to let the claim be made, and the Supreme Court affirmed that decision. *INS v. Doherty*, 502 U.S. 314 (1992). In that instance, an Irish nationalist had murdered a British Army officer and claimed that he was persecuted on account of his political opinion of Irish nationalism. In that case, as in the present, an identifiable group of people with political grievances, nationalist sentiments, and a particular religion had rejected the peaceful political process and opted for violent confrontation. Both that claim and this occur against a backdrop of alleged police misconduct.

We know that the Sikh extremists, as well as the violent Irish

nationalists, have a political program that, in their minds, justifies violence. What the Sikh extremists want and how they operate is no mystery to the Indian public, and most certainly not to the Indian police, who know how many policemen have been killed and the suffering that the extremists have caused. The police did not start this violence; the police did not one day decide to start killing Sikhs and drive them out of Punjab. How incredibly odd that the dissenting opinion assigns them the onus of "persecution." What a remarkable juxtaposition of victim and killer.

And here I will be as blunt as possible: Given the viciousness with which the extremists have murdered so many persons, among them many policemen and their families, would one realistically expect gentle treatment? It ill behooves us to label as agents of persecution the very people the Sikh extremists murder with abandon when they have the opportunity. We know from our own history that policemen who consider themselves targets of extremists understandably react in ways that have little to do with constitutional theory, or conventional police procedures. Let us remember the fate of the Symbionese Liberation Army in Los Angeles and the Black Panthers in Chicago.

The dissenting opinion is correct in one respect in citing *Blanco-Lopez v. INS*, 858 F.2d 531 (9th Cir. 1988), in support of the proposition that mistreatment by the police is viewed in the Ninth Circuit as a form of persecution. That decision found as persecution supposedly threatened mistreatment of a former employee of the Salvadoran Government who had been accused of gun running on behalf of Salvadoran guerrillas who were attempting to overthrow the Government of El Salvador through a program of violence and murder, acts universally considered to constitute treason or sedition. The Ninth Circuit found that the Salvadoran Government "believed him to be a guerrilla and attempted to persecute him for it," that he faced "*persecution* based on Blanco-Lopez's perceived political beliefs." *Id.* at 534. The court, however, through oversight or design, never defined what the "political beliefs" of a guerrilla might be. It would appear that the Ninth Circuit holds the entirely novel view that the violent overthrow of a democratically elected government is a "political opinion" like any other and that no government may object to its expression. If a guerrilla organization arose in this country aimed at the violent overthrow of the Federal Government through a program of murder of government and law enforcement officials and federal judges, it would appear that governmental suppression of this organization would be an act of persecution in the Ninth Circuit. After all, if that court could find that the Government of El Salvador "persecuted" Blanco-Lopez because it believed him "to be a guerrilla," then it is clear that "being" a guerrilla is somehow a form of "political

636

opinion," regardless of the actual objectives of the guerrillas and their methods. If this is so, then that court could not logically object to the murder of federal judges by "guerrillas" who are only acting out their "political opinion," whether it be a form of Marxism or "Aryan supremacy."

I am aware that the Ninth Circuit arrived at the conclusion that "being" a guerrilla is a form of political opinion by constructing a syllogism. In this syllogism, the court applied two premises. The first is that the mistreatment Blanco-Lopez feared was not a "legitimate criminal prosecution." *Blanco-Lopez v. INS, supra*, at 534. No one of course had said that it was. The court's second premise was that if the feared police actions were not prosecution, then they constituted "persecution." This is a faulty, unfounded second premise, more in the nature of a slogan than a statement of fact. It is not a legal or logical principle that anything that is not prosecution is therefore persecution. "Illegitimate" police actions may be many things: simple acts of criminality, abuses of authority, or acts of sadism. If it follows, as the Ninth Circuit assumes, that all that is not prosecution is persecution, then an ill-treated burglar or rapist could claim persecution on account of "being" in a social group of burglars or rapists.

But this logical failing aside, if it is true that "being" a guerrilla is the acting out of a political opinion that policemen should be killed, I would still reject the proposition that this is a form of "political opinion" protected by the asylum laws. If a "political opinion" of this type is protected, then so is the view that Jews should be killed because they are believed to control the world, or that federal judges should be murdered because they are considered an instrument of repression of Caucasian Christians.

It is clear to me that such an application of the term "persecution" was untenable even before *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). But now, there is surely no life whatsoever in the *Blanco-Lopez* analysis. It is inconceivable that any person could claim that he is persecuted "on account" of suspicion of "being" a gun-running guerrilla. "Being" a guerrilla is not a form of political opinion. "Being" a guerrilla means being engaged in acts of violence and illegality. I know of no legal principle or form of logic that states that "being" engaged in such acts automatically transforms the "political opinions" that drive those acts into a form of political opinion protected by United States law. Under this theory, Serbian guerrillas who wish to "cleanse" Bosnia of Moslems would obtain asylum in the Ninth Circuit.

The applicant here, for substantial reasons, was suspected of helping members of an extremist organization which has murdered many persons, including policemen, in furtherance of the political goal of

independence of "Khalistan." If caught, he faces the distinct possibility of being mistreated. I can only assume that the dissenting member would consider this person an object of persecution, on account of the facts that Indian policemen wish to "overcome" or disagree with the "political opinion" that policemen should be killed, and that they might abuse him if they catch him. How marvelous. Perhaps we could offer asylum to a Sikh who has bombed a bus and killed innocent men, women, and children of several religions, Sikhs included, on the ground that he risks certain death if caught for such an outrageous act.

One faces the remarkable possibility under *Blanco-Lopez* that the more egregious the act and the greater the outrage, the higher the probability of being granted asylum, on the ground that claimed police mistreatment will be on "account of political opinion," not human failings, vengeance, or anger provoked by the extremists' acts. It never occurred to the court in *Blanco-Lopez*, after all, that the police officials of El Salvador might reasonably be angered by their well-founded belief that he was providing guns to persons who killed soldiers and policemen, not by his "political opinion," which, of course, they had shown no interest in whatsoever prior to their receipt of information that he was gun-running. This interpretation would be directly contrary to the holding of *INS v. Elias-Zacarias, supra.*

In the present case, there is simply no basis in history or logic to find persecution of the applicant on account of religion, or on the basis of political opinion protected by the Refugee Act of 1980, *supra.* If the dissenting member wishes to accord asylum to persons who are thought to have helped violent Sikh terrorist organizations which have murdered Hindu, Moslem, and Sikh men, women, and children, then it should be openly stated. If this is the "political opinion" in question, and I can see no other that applies, then our asylum law would be put to an entirely unintended use by such an application. If the applicant here succeeds, then those Sikhs who have in fact committed acts of violence and murder would be entitled to asylum also, on the simple ground that they have either been mistreated by the police, or fear such mistreatment. What a perverse application of laws intended to accord sanctuary to the persecuted of the world.

For these reasons and those stated by the majority I would also dismiss the appeal.