# In re C-A-L-, Respondent

*Decided February 21, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) An alien, who served as a soldier in the Guatemalan Army, has not established a well-founded fear of persecution by the guerrillas on account of one of the five grounds enumerated in section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1994), where he claims that his personal file from the army fell into the hands of the guerrillas, who sought to recruit him for his artillery expertise.

(2) An alien has failed to establish that he has a well-founded fear of country-wide persecution from the guerrillas in Guatemala where he was able to live for more than 1 year in different areas within the country, including an area well known for its guerrilla operations, without experiencing any problems from the guerrillas.

FOR RESPONDENT: Patricia M. Spicer, Esquire, Alexandria, Virginia

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Linda A. Dominguez, Assistant District Counsel

BEFORE: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Dissenting Opinions: SCHMIDT, Chairman; ROSENBERG, Board Member.

HURWITZ, Board Member:

The respondent's appeal from an Immigration Judge's decision dated October 13, 1995, finding him deportable as charged, denying his applications for asylum and withholding of deportation under sections 208 and 243(h), of the Immigration and Nationality Act, 8 U.S.C. §§ 1158 and 1253(h) (1994), respectively, but granting him voluntary departure, will be dismissed.

## I. FACTUAL BACKGROUND

The respondent is a 27-year-old male, native and citizen of Guatemala, who entered the United States without inspection on December 15, 1991. The respondent was a soldier in the Guatemalan Army from November 1, 1986, to April 30, 1989. He was trained as an artillery specialist.

The respondent testified that, as a soldier, he was sent on separate occasions into the mountains to combat guerrilla forces. He was involved in various confrontations in which several soldiers and guerrillas were killed. On March 15, 1989, the respondent and his unit were leaving a conflict area in the mountains when their convoy of trucks was ambushed by guerrillas. Many soldiers were wounded and killed in this incident.

In addition, as a result of the ambush, certain military files fell into the hands of the guerrillas. These files contained personal information about five soldiers who would be discharged in the Spring of 1989, including their names, civilian addresses, and military experience. The respondent's file was among this lot.

The respondent was discharged as planned and went to live with his father. In September 1989, the respondent came across a friend who was one of the four soldiers discharged from the army with him. This friend informed the respondent that he had received a note from the guerrillas requesting that he and the other four discharged soldiers present themselves to the guerrillas.

At the time, the respondent had joined a political organization and did not want to get involved with the guerrillas. The respondent knew the guerrillas had personal information on him. Fearing the guerrillas would harm him, he moved to a different area on September 30, 1989.

The respondent returned for a brief visit to see his father in December 1989. At this time he had another discussion with his friend, who told the respondent that he had received a second note from the guerrillas. His friend stated that the guerrillas were looking for both of them and that their lives were in danger. In January 1990, the respondent moved away to yet another location. In December 1990, the respondent learned from his father that his friend had been killed by the guerrillas.

Fearing that he was not safe anywhere in Guatemala, the respondent went to Belize in January 1991. When his tourist visa had expired in April 1991, he returned to see his father. The respondent's father had received notes from the guerrillas asking for the respondent's whereabouts. Therefore, the respondent went back to Belize within the same month.

The respondent's father continued receiving notes through October 1991, when the respondent returned one last time to see his father before leaving for Mexico on his way to the United States. Prior to his asylum hearing, the respondent had communicated with his father, who told him that the guerrillas were still looking for him at the time.

## II. THE IMMIGRATION JUDGE'S DECISION

The Immigration Judge questioned the respondent's testimony about the guerrillas' motives in seeking to harm the respondent on account of his service in the Guatemalan Army. The Immigration Judge noted that although the respondent tried to escape from the guerrillas by leaving his home town,

he moved to an area where he knew from his military experience that the guerrillas were active. The Immigration Judge stated that it was unreasonable for the respondent to move there to seek safety from the guerrillas knowing that they operated in that region.

The Immigration Judge found that the respondent's move to an area occupied by the guerrillas and his ability to survive for a year without incident undermined his claim that it was fear of the guerrillas that led him to move there. If the respondent were truly trying to avoid the guerrillas, it would be more likely that he would move to a region known to have little guerrilla presence. The Immigration Judge held that the respondent did not demonstrate past persecution or a reasonable possibility of future persecution and, therefore, did not meet the definition of "refugee" as provided in section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). The respondent appeals from this decision.

## III. WELL-FOUNDED FEAR OF PERSECUTION

The respondent bases his application for asylum on a well-founded fear of future persecution by the guerrillas in his country due to his past service in the Guatemalan Army and his failure to join the guerrillas' efforts. On appeal, the respondent argues that the evidence in the record compels a finding that the guerrillas would persecute him on account of his political opinion and past membership in the military and not solely because they were trying to obtain information from him or impress him into their service. The respondent argues that the Immigration Judge erred by failing to find that he had a well-founded fear of persecution if he returned to Guatemala.

The burden of proof is upon an asylum applicant to establish that a "reasonable person" in his circumstances would fear persecution upon return to his native country. *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). In addition, to be eligible for asylum, the applicant must establish that his well-founded fear of persecution is "on account of" one of the five grounds specified in the Act, here, his political opinion or his membership in a particular social group.

In the present case, the respondent claims that he fears returning to Guatemala because the guerrillas have targeted him as a former soldier. He distinguishes himself from the majority of the soldiers by indicating that his personal file fell into the hands of the guerrillas after an ambush in the mountain region of Guatemala. With this file, he argues, the guerrillas know what experience he has had in the army and can locate him through his civilian addresses on record.

Even accepting this as true, the respondent has failed to submit adequate evidence from which we could reasonably surmise that the guerrillas' interest in him relates to his imputed political opinion. Instead, the record demonstrates that the guerrillas' interest in the respondent was not "on account of"

any ground protected in section 101(a)(42)(A) of the Act. The respondent himself testified that the reasons the guerrillas had for contacting him were to obtain information about the army troops and their actions against the guerrilla groups, and to attempt to recruit him due to his expertise as an artillery specialist. Without more, we are unable to discern that the guerrillas sought the respondent for any purpose except those he described. We therefore find that the respondent has not established facts on which a reasonable person would fear that danger arises on account of his race, religion, nationality, membership in a particular social group, or political opinion. I*NS v. Elias-Zacarias,* 502 U.S. 478 (1992); *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). For this reason, the respondent's application for asylum must be denied.

## VI.  COUNTRY-WIDE PERSECUTION

The respondent's asylum claim must also be denied because he has not provided any convincing evidence to suggest that his fear of persecution would exist throughout Guatemala. This Board has found that an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place within a country. He must show that the threat of persecution exists for him country-wide. *Matter of R-,* 20 I&N Dec. 621 (BIA 1992); *Matter of Acosta,* 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

The Department of State country conditions report on Guatemala states that the numbers of guerrillas have declined through the years, the guerrillas are concentrated in remote areas with large Indian populations not easily accessible to government control, and the threat to the general population has decreased. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Guatemala-Profile of Asylum Claims & Country Conditions* (Aug. 1995). In addition, given the poor infrastructure of the various guerrilla groups, most low-profile victims of localized harassment by the guerrillas can relocate away from the area where they experienced problems, instead of seeking asylum in a foreign country. *Id.; see also Rojas v. INS*, 937 F.2d 186, 190 n.1 (5th Cir. 1991); *Matter of R-, supra*. The respondent acknowledged at the hearing that he was able to move to another area because a different guerrilla group was active in that part of Guatemala.

We do not consider the respondent to be a high-profile victim of harassment by the guerrillas. Moreover, we find that his problems were confined to his hometown. The respondent testified that he received letters from the guerrillas only at his father's home. Although the guerrillas may have been looking for him, he experienced no problems while he was living in other areas of the country. In fact, he was able to live and work in another location for a year without incident despite the well-known guerrilla operations in that area of

the country. We therefore, find that conditions in Guatemala are not such that the respondent would have a well-founded fear of returning to that country.

Having failed to meet the "well-founded fear of persecution" standard required for a grant of asylum, the respondent has also failed to meet the higher "clear probability" standard required for withholding of deportation. *See Matter of Mogharrabi, supra.* Accordingly, the appeal will be dismissed.

**ORDER:**    The appeal is dismissed.

**FURTHER ORDER:**    Pursuant to the Immigration Judge's order and in accordance with this Board's decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extensions that may be granted by the district director, and under such conditions as the district director deems appropriate; and in the event of failure to so depart, the respondent shall be deported as provided in the Immigration Judge's order.

*DISSENTING OPINION:* Paul W. Schmidt, Chairman

I respectfully dissent.

This case presents three issues: (1) whether the respondent has established a well-founded fear of persecution in Guatemala; (2) whether internal resettlement is a reasonable alternative; and (3) whether the recent peace accords in Guatemala have an impact on the respondent's asylum claim. As set forth below, I conclude that: (1) the respondent has established a well-founded fear of persecution on this record; (2) the current record is inconclusive on the internal resettlement alternative; and (3) the case should be remanded to the Immigration Judge for the parties to explore the impact on the respondent's claim of the recent peace accords in Guatemala.

## I.  WELL-FOUNDED FEAR

The respondent presented credible testimony establishing that he was part of a group of five former Guatemalan soldiers who fought the guerrillas and whose personnel files fell into the hands of the guerrillas shortly before the group of five was discharged from the Guatemalan military in April 1989. The respondent's credible testimony also establishes that one member of the group of five was killed by the guerrillas in 1990 and that threats against the respondent by the guerrillas continued even after his final departure from Guatemala in October 1991.

On this record, I conclude that a reasonable person in the respondent's situation would believe that he has at least a 10 percent chance of being persecuted because of imputed political opinion if returned to Guatemala. *See INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). This conclusion is consistent with *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). In *S-P-*, which involved past persecution, we found that a respondent need not conclusively show the persecutor's motive. Rather, we observed that a respondent must present

evidence, either direct or indirect, from which it is reasonable to believe that the harm was motivated at least in part by the respondent's actual or imputed political opinion. That test has been met here.

The majority, in effect, concludes that the guerrillas sought the respondent exclusively because of his ability to provide strategic information. That conclusion seems unlikely.

The respondent was trained as an artillery specialist. I doubt that the guerrillas would have persisted in pursuing the respondent for 2½ years just to obtain outdated strategic information on artillery operations or troop deployment. The killing of the respondent's colleague by the guerrillas in 1990 also seems inconsistent with a desire to obtain strategic information. The more plausible conclusion is that the guerrillas pursued the respondent and his colleagues to punish them for their imputed political support of the Guatemalan Government and their active opposition to the guerrillas' political aims.

Because a reasonable person in the respondent's situation would fear persecution if returned to Guatemala, the respondent has established a well-founded fear of persecution in accordance with *Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987).

## II.  INTERNAL RESETTLEMENT ALTERNATIVE

Turning to the internal resettlement alternative, I agree that it is appropriate to require a refugee who has a reasonable internal resettlement alternative in his own country to pursue that option before seeking permanent resettlement in the United States. On the other hand, the internal resettlement alternative must be carefully applied. It should not be a routine basis for denying protection to refugees just because they cannot produce evidence to negate every possibility of internal relocation. The test for the internal resettlement alternative is whether, under all the circumstances, internal resettlement is a reasonable possibility.

Initially, a refugee who fears persecution from a nongovernmental body should produce some evidence regarding the internal resettlement alternative. However, the burden of proof is shared. Once the respondent has made some showing on the internal resettlement alternative, the Immigration and Naturalization Service also should provide evidence on the viability of the alternative. *Cf. Matter of Vivas,* 16 I&N Dec. 68, 71 (BIA 1977) (stating that the burden of going forward with evidence may be placed on the party having better control or knowledge of the evidence). In fact, much of the documentary information and expert testimony available on this subject would be more accessible to the Service than to respondents. This is particularly true because of the existence of the Service's Resource Information Center. The internal resettlement alternative should be applied only if the Immigration Judge or we find that a preponderance of the evidence establishes that internal resettlement is a reasonable possibility.

The respondent has made some showing that internal resettlement is not a reasonable possibility. In that respect, I note that Guatemala is a relatively small country, a factor we deemed significant in *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996). The respondent has shown that the guerrillas possess personal identifying details gleaned from his captured military file, and that they possess both the means and the inclination to continue to pursue and harm him. Additionally, the record contains the 1995 country profile from the U.S. Department of State, which establishes that considerable guerilla-instituted violence continues to plague Guatemala. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Guatemala-Profile of Asylum Claims & Country Conditions* (Aug. 1995) [hereinafter *Profile*]. The respondent also testified that he had to move several times to avoid the guerrillas before leaving Guatemala for good in 1991.

On the other hand, the Service can point to evidence in the *Profile* indicating that guerilla strength in Guatemala is diminishing and that guerrillas are concentrated in more remote areas. The *Profile* states in conclusory terms that low-profile victims of localized guerilla harassment may seek internal relocation. However, it is by no means clear that an individual in the respondent's situation can be characterized as "low-profile" or that credible death threats can be characterized as "harassment." The Service also can point out that the respondent lived for a year in a known guerilla-infested area without suffering any actual harm.

It is also possible that the Immigration Judge's negative consideration of the internal resettlement alternative was colored by his conclusion that the respondent did not have a well-founded fear of persecution.

I find the current record inconclusive with respect to the internal resettlement alternative. Because this is a question with potential life or death significance, I would remand the case to the Immigration Judge to have this matter redetermined under the criteria set forth above. *See Matter of H-*, 21 I&N Dec. 337 (BIA 1996) (remanding to give the parties an opportunity to further develop the record).

## III.  CHANGED CONDITIONS—IMPACT OF RECENT PEACE ACCORDS

In addition, I take administrative notice that on December 29, 1996, a peace accord was signed by the Government of Guatemala and the guerillas. *See* Committees on Foreign Relations and International Relations, 105th Cong., 1st Sess., *Country Report on Human Rights Practices for 1996* (Joint Comm. Print 1997). Because the hearing before the Immigration Judge occurred in October 1995, the impact of the peace accords was neither considered by the Immigration Judge nor addressed by the parties. Interestingly, neither party has brought this potentially significant new development to our attention through supplemental filings.

The change in country conditions potentially affects the respondent's well-founded fear and the reasonableness of internal resettlement. Both these questions should be explored upon remand.

## IV. CONCLUSION

I conclude that the respondent has established a well-founded fear of persecution on this record. I also conclude that the record is inconclusive on the question of the internal resettlement alternative. Additionally, the recent peace accords in Guatemala could have an impact on the respondent's claim. Therefore, I would remand the record to the Immigration Judge to have the respondent's well-founded fear and the internal resettlement alternative reexamined in light of the appropriate legal criteria and current country conditions in Guatemala.

For the foregoing reasons, I respectfully dissent from the majority's decision to dismiss the respondent's appeal.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

I dissent from the decision of the majority and concur with much of the rationale of the well-reasoned dissent of Chairman Schmidt. However, I differ with his conclusion as to the disposition of this case. I offer, in addition, the following points in support of a different result.

## I. PERSECUTION BASED ON MILITARY STATUS

The majority concedes that the respondent, whose credibility has not been questioned, became known to the guerrillas when his military file, complete with personal information, came into their hands. Nevertheless, the majority contends they cannot "surmise" or "discern" any reason why the guerrillas would have any interest in the respondent, a former military officer, other than, (1) their desire to obtain military information, and (2) their desire to recruit him. *Matter of C-A-L-*, 21 I&N Dec. 754 (BIA 1997).[1]

It does not take much imagination to see that in such a situation, it is reasonable to believe that the guerillas could easily harbor multiple motives towards a former soldier. *See, e.g., Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994) (citing *INS v. Elias-Zacarias* 502 U.S. 812 (1992) (emphasizing that the plain meaning of the phrase "on account of political opinion" does not mean that the persecutor is motivated to harm the victim *solely* on account of the victim's political opinion)); *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996).

---

[1] It is noteworthy that the "statements" of the respondent upon which the majority relies—that the guerrillas wanted him for the military information he possessed—were not offered by the respondent. They were his monosyllabic affirmations acquiescing to questions put to him by the Immigration Judge suggesting that these were the motives of the guerrillas. The respondent stated only that the guerrillas wanted him because of his *experiences* in the army.

The respondent is not required to establish conclusively the guerrillas' motives in threatening him, threatening and killing his friend (one of the soldiers discharged with him whose military file also was seized by the guerrillas), and seeking to kill him. The proper standard to apply in judging whether the respondent has a well-founded fear of persecution is whether, taking into consideration subjective and objective factors, a reasonable person in like circumstances would fear persecution on account of a belief or affiliation protected under the statute. *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *M.A. v. INS*, 899 F. 2d 304, 311 (4th Cir. 1990) (en banc); *see also Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

The Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1992)("*Handbook*")[2] specifically recognizes, as have we, that often the asylum applicant himself may not be aware of the reasons for the persecution visited upon him or feared. *Id*. para. 66, at 17; *see also Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984) (stating that persecutors are not likely to provide their victims with evidence of their motives and that an asylum applicant's credible testimony can satisfy the requirement for objective evidence); *Matter of S-P-, supra.*

It would be most unusual if the guerrillas did not attribute any political opinion to the respondent, knowing him to be a former military officer. It would be equally unlikely if the opposing force's interest in the respondent was devoid of any individual political objective to punish him for his affiliation with the military which they found offensive, or if their interest, as posited by the majority, was only to acquire whatever strategic information might be in the respondent's possession or to recruit him. It is highly improbable, given both the history of conflict in Guatemala and the nature of the specific death threats made and carried out, that the guerrillas viewed this former member of the military forces in Guatemala solely as a neutral source of intelligence, and nothing more.

Indeed, the likelihood that the guerrillas possess a persecutory motive as to the respondent is raised by his testimony, not mentioned by the majority, that he was "feeling afraid" of what happened when his military file was seized by the guerrillas. It is also consistent with his affidavit, also not

---

[2] The *Handbook* provides practical guidance to government officials as they are determining refugee status under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which was enacted to bring United States refugee law into conformance with our international obligation of nonrefoulement under the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150, and the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"). *INS v. Cardoza-Fonseca, supra*, at 436-37 (1987); *Matter of Q-T-M-T-*, 21 I&N Dec. 639 (BIA 1996) (Rosenberg, dissenting); *Matter of Rodriguez-Palma,* 17 I&N Dec. 465, 468 (BIA 1980).

mentioned by the majority, which was attached to his asylum application and in which he states that the threats he received from the guerrillas, in the form of notes they left and in their direct communications with his father, indicated that they intended to kill him because of his former position in the military. It also is consistent with objective circumstances described by the respondent in his testimony, such as the murder of his friend, a former soldier, and indicated in the Department of State country profile. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Guatemala- Profile of Asylum Claims & Country Conditions* (Aug. 1995) [hereinafter *Profile*].

An individual's fear that he will suffer harm at the hands of guerrillas because of his status as a former military officer, when supported by "objective circumstances personally known to him," has been held to provide a basis for granting asylum. *See Montecino v. INS*, 915 F.2d 518, 520 (9th Cir. 1990); *see also Chanco v. INS*, 82 F.3d 298, 303 (9th Cir. 1996); *Matter of Fuentes,* 19 I&N Dec. 658, 662 (BIA 1988). Moreover, there is authority that even if the guerrillas did seek out the respondent in part because of his training and the information that he may have possessed, such a motive on the part of a persecutor may qualify as persecution within the meaning of the Act. *See, e.g., Artiga-Turcios v. INS*, 829 F.2d 720, 722-23 (9th Cir. 1987) (holding that an ominous visit from the guerrillas following the respondent's discharge from the military was more than coincidence and constitutes a cognizable threat which warrants a grant of asylum).

The United States Court of Appeals for the Fourth Circuit, in which this case arises, holds that an applicant for asylum must present specific facts concerning the individual predicament he faces in order to distinguish himself from the dangers faced by the applicant's fellow citizens. *Figeroa v. INS*, 886 F.2d 76, 80 (4th Cir. 1989) (citing *Cruz-Lopez v. INS,* 802 F.2d 1518, 1522 (4th Cir. 1986) (finding that because Cruz-Lopez offered no other evidence "in the form of repeated threats . . . tending to indicate the threat he received was serious or that the guerrillas will persist in their recruiting effort," he failed to establish an objectively well-founded fear)); *see also Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1986), *aff'd, INS v. Cardoza-Fonseca, supra.*

A note and a visit have been held sufficient to support a well-founded fear of persecution. Aguilera-Cota v. INS, 914 F.2d 1375, 1379-80 (9th Cir. 1990) (holding an anonymous note threatening harm based on government employment and a visit by an unidentified man constitutes "specific evidence" adequate to satisfy the applicant's burden); *see also Canjura-Flores v. INS*, 784 F.2d 885, 887 (9th Cir. 1985) (reversing denial of asylum where petitioner, active with a leftist organization, believed the National Guard was seeking him out and received information that, after his flight, they had come to his home looking for him); *Sotelo-Aguije v. Slattery*, 17 F.3d 33 (2d Cir. 1994) (holding that evidence of threats alone is sufficient to establish a well-founded fear and the absence of physical harm or a face-to-face

confrontation is not determinative), *rev'd on other grounds,* 62 F.3d 54 (2d Cir. 1995); *see also Sotelo-Aguije v. Slattery,* 62 F.3d 54 (2d Cir. 1995).

The respondent here provided specific facts going beyond the general climate of violence or the fact of an ongoing civil war in Guatemala. He testified credibly to repeated notes containing death threats, to his now-deceased friend's communication that the guerrillas had told him they were going to kill the respondent, and to the guerrillas' repeated, continuing threatening visits to his father. Whether judged against a measure of "other Guatemalan males," or "other Guatemalan former military personnel," the respondent has distinguished himself from others in his country by providing specific objective facts which support an inference of risk of future persecution. *Figeroa v. INS, supra*, at 80, (citing *Cardoza-Fonseca v. INS, supra*, at 1453).

I concur with Chairman Schmidt that the majority has unreasonably dismissed the plain and uncontroverted facts suggesting the guerrillas have a mixed persecutory motive in pursuing the respondent.

## II. "COUNTRY-WIDE" PERSECUTION

The principle flaw in the majority's analysis leading to their conclusion that the respondent has not met his burden of demonstrating a reasonable fear of persecution throughout Guatemala is that the guerrillas first encountered the respondent in an ambush in a mountainous department within Guatemala, yet managed to pursue both the respondent and the other former soldier to a different department. To my mind, this is uncontroverted evidence that the guerrillas are highly mobile and raises grave doubts about the majority's conclusion that the respondent's "problems were confined to his hometown." *Matter of C-A-L-, supra*, at 757, (BIA 1997).

Guatemala is slightly smaller than Virginia, making the majority's proposition that the respondent's fear of persecution could be considered reasonable only in his hometown, but not in the other areas where he lived, about as reasonable as saying that an individual's fear of persecution in Alexandria, Virginia, would not be reasonable in Richmond. See also Matter of Kasinga, 21 I&N Dec. 357 (BIA 1996) (finding that Togo is a relatively small country, making a fear of country-wide persecution reasonable even when arising out of a local conflict).

The *Profile, supra*, provided by the Department of State, relied upon by the majority, is equivocal. It can be cited more readily for the proposition that the respondent faces a likelihood of persecution than for the proposition that he does not. For example, the *Profile* states that, while reduced somewhat in their numbers, the guerrillas are still active, and that their size "has not hampered the violence they employ." *Id*. at 4. The objects of the guerrillas' threats and violence are reported to include persons associated with the government, *id*. at 5, which certainly would include a former solider. Given that the respondent's burden is to establish a reasonable possibility of

persecution, this information provides adequate support for his contentions that the guerrillas ambushed his military unit in one department, pursued him to a different department, killed a similarly situated former military companion, and continued to make death threats against him, even after his father informed them he had fled to Belize.

A secondary problem, with due respect to my colleagues, is the reasoning in *Matter of R-*, 20 I&N Dec. 621 (BIA 1992). There is no statutory, constitutional, or international requirement that an asylum applicant demonstrate "country-wide persecution." "[T]here is also no reason . . . why the fear of persecution should relate to the whole of the asylum-seeker's country of origin . . . ." Guy Goodwin Gill, *The Refugee In International Law* 42 (1983). While related, the requirement that a refugee must be unwilling or unable to return to one's country to qualify as a refugee in need of international protection, and the consideration of whether it would be unreasonable to expect a refugee to relocate internally, are not as entwined, as the majority might prefer.

*Matter of R-, supra*, cited by the majority, has been widely criticized. *See* Ignatius, *Asylum: Country-Wide Persecution*, 21 Nat'l Immigr. Project of the Nat'l Law. Guild, Inc., Immigr. Newsletter, No. 1 (1993). It also has been soundly rejected by the United States Court of Appeals for the Ninth Circuit, and all but abandoned elsewhere for practical purposes. *See Singh v. Ilchert,* 63 F.3d 1501 (9th Cir. 1995); *Damaize-Job v. INS*, 787 F.2d 1332, 1336 (9th Cir. 1986); *see also Abdel-Masieh v. United States INS,* 73 F.3d 579 (5th Cir. 1996); *Matter of S-P-, supra; cf. Matter of Fuentes, supra; Matter of Acosta,* 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi, supra.*

To my mind, the decision overstates the point. The *Handbook* makes clear that country-wide danger is not an absolute requirement, stating that "[t]he fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality." *Handbook, supra*, para. 91, at 21-22. For example, in the case of government-sponsored, persecution suffered in the past, the courts have imposed a presumption of nationwide persecution, requiring the Immigration and Naturalization Service to show that the "persecutive actions are truly limited to a clearly delineated and limited locality and situation." *Abdel-Masieh v. United States INS, supra*; *see also Singh v. Ilchert, supra.* In addition, even where evidence of country-wide persecution is absent and the local character of the persecution is not disputed, the Ninth Circuit has not required actual acts of persecution nationwide, but has looked to the persecutors' *intent* to persecute in a broad geographic area. *Damaize-Job v. INS, supra,* at 1336; *see also* Ignatius, *supra.*

When the persecutor is a nongovernmental force, an asylum applicant may be charged with demonstrating that he or she cannot reasonably be expected to relocate within the country of persecution. *Handbook, supra*,

para. 91, at 21-22. The internal relocation principle has been interpreted as being a restriction applicable to persons who "can *genuinely access* domestic protection and for whom the reality of protection is meaningful." J. Hathaway, *The Law of Refugee Status* 134 (1991). Determinations of "reasonableness" include consideration of likely financial or logistical barriers to internal relocation, as well as the circumstances which fail to satisfy civil, political, and socio-economic human rights norms, or to place the refugee in illusory or unpredictable situations. *Id.*

While the Fourth Circuit has not yet expressly addressed the question of "country-wide" persecution, there is no reason to presume that the standard for determining whether an asylum applicant can reasonably relocate to a zone of safety in the country of persecution is other than that contemplated by the *Handbook, supra*, para. 91, at 21-22, as "for various reasons it may be unreasonable to expect the asylum-seeker to move internally." Guy Goodwin Gill, *supra*. In this case, it does not appear that there is a zone of safety within Guatemala to which the respondent reasonably could be expected to relocate.

This is not a problem of local origin, nor is it confined to a local area, despite the effort of the majority to make it seem so. The respondent indicated that the guerrillas were looking for him "wherever [he] was." He testified, despite the Immigration Judge's misleading and possibly intimidating remark questioning how the respondent could dare to contradict the Department of State *Profile*,[3] that there were guerrillas in Guatemala City. There is nothing in the record to indicate that the guerrillas are not mobile or that their operations are limited to only a discrete area of the country, or that they do not have the intent to pursue the respondent nationwide. Indeed, as the record reflects, they encountered the respondent and his fellow soldiers in one province, and they threatened the respondent, and accosted and apparently killed his friend and former soldier, in another province.

This respondent attempted, out of fear, to move on three different occasions during the course of an 18-month period, and finally, when he learned his compatriot had been killed, out of the country temporarily on a tourist visa to Belize. He returned to learn that the guerrillas had approached his father while he was in Belize, again seeking his whereabouts. *Matter of C-A-L-, supra*. The object of attempted relocation is not that the respondent must run from place to place, or suffer harm when harm is threatened, before we accept that he or she is a refugee.

Where a persecutor shows no clear intent to limit his persecution to any one geographical area of a country and the potential victim can readily be identified by his persecutors, a conclusion that the risk of persecution does not exist country-wide is unfounded. *See Damaize-Job v. INS, supra*. Here,

---

[3] In fact, the *Profile* doesn't state that there are no guerrillas in Guatemala City or in other departments in Guatemala; it states only that the guerrillas are most prominent in the rural highlands.

the record reflects that the guerrillas operated readily between two or more departments in a relatively small country; there is no evidence suggesting they could not operate in any department of the country, even if other guerrilla factions were more prominent there. There is no evidence to suggest that they have limited their persecution to a specific area.

In a case such as this one, where we have strong indications that these guerrillas were mobile and determined to pursue the respondent, we should recognize the essential role played by the "benefit of the doubt." *See Handbook, supra*, para. 196, at 47 (stating that while the burden may lie with the applicant, in cases containing some statements not susceptible of proof, a credible applicant should be given the benefit of the doubt); *see also id.* paras. 203, 204, at 48.  The respondent has established a reasonable likelihood the persecution he fears is nationwide in scope.

## III.  SATISFACTION OF BURDEN AND EXERCISE OF DISCRETION

The majority stands logic on its head by requiring the respondent to disprove what amounts to a questionable presumption that he would not be persecuted throughout Guatemala. *Matter of C-A-L-, supra; Matter of R- supra,* at 627. Generalizations derived from the *Profile*, such as that the guerrilla forces operate principally in remote areas, or that "low-profile" victims can relocate, provide little comfort to the victim of those guerrilla units, fewer though they may be, which are *not* operating only in remote areas or targeting only "high-profile" opponents. The respondent's fear must only be reasonable, interpreted by the Supreme Court to mean a 1 in 10 chance of suffering persecution, not a 90 or 50 percent chance of suffering persecution. *INS v. Cardoza-Fonseca, supra; M.A. v. INS, supra*.

The majority's contention that the respondent was able to live in an area occupied by guerrillas undisturbed for a year must be taken in context with contemporaneous events. During that same year or shortly thereafter, the guerrillas appear to have murdered his friend, a former soldier, and continued to threaten the respondent. Persecution need not be a certainty; it is the risk of persecution that our laws protect.

Furthermore, I know of no standard which requires an asylum seeker to demonstrate that he is a "high-profile victim of harassment" by the guerrillas to establish a well-founded fear of persecution. *Matter of C-A-L-, supra*, at 757. Nor am I aware that we, or the federal courts, have ever held that because an individual has not "experienced any problems" (i.e. been persecuted or killed) in the course of flight—even during a 1-year period—constitutes conclusive evidence that an individual does not have a well-founded fear of persecution. *See Ramirez-Rivas v. INS*, 899 F.2d 864, 871 (9th Cir. 1990) (rejecting a reading of the Immigration and Nationality Act which requires the persecutor to be in "hot pursuit" when he flees the country).

As discussed above, and in Chairman Schmidt's opinion, there is ample reason to find that the guerillas pursued the respondent out of a political motive. There is little basis to attribute an exclusively nonpolitical motive to the guerrillas' interest in harming or ability to harm the respondent on account of his status as a former military officer. *Matter of S-P-, supra*. I would conclude that on this record, the respondent has satisfied his burden and, barring any adverse discretionary factors which have not been presented here, he should be granted asylum.

I recognize that we are determining a likelihood of harm in the future in Guatemala, and that during the pendency of this appeal there have been peace accords signed. However, we are not required to take administrative notice of such events. *Ademi v. INS*, 31 F. 3d 517, 520 (7th Cir. 1994). We have no information as to how these accords have been or will be effectuated. Furthermore, an official change in government or formal cessation of hostilities between political opponents says little about the continuing danger to an individual asylum applicant. As Chairman Schmidt has noted, no party has come forth with any additional evidence for us to consider, either on its merits or for purposes of remand while this appeal has been pending.

Remand is not the result required when the respondent has met his burden, as I find him to have done. I believe it is appropriate to look to the record as it exists at the time of our adjudication to render our decision and issue our opinion. *Figeroa v. INS, supra*, at 77 n.1. Nothing on the record before us now calls for a different conclusion than granting the asylum application. Consequently, I would sustain the appeal.