# United States Court of Appeals
## For the First Circuit

---

No. 00-1971

ZEESHAN MANZOOR,

Petitioner,

v.

UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION &
NATURALIZATION SERVICE

Respondents.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Selya, Lynch, and Lipez, Circuit Judges.

---

Madeline G. Compton for petitioner.
Lyle D. Jentzer, Attorney, Office of Immigration Litigation, Civil
Division, with whom David W. Ogden, Assistant Attorney General, Civil
Division, and Terri J. Scadron, Senior Litigation Counsel, Office of
Immigration Litigation, were on brief, for appellee.

---

June 26, 2001

---

**LIPEZ, Circuit Judge.** Zeeshan Manzoor petitions for relief from the denial of his claims for asylum and withholding of deportation. To qualify for asylum, an applicant must show that he or she faces a well-founded fear of persecution. The Board of Immigration Appeals (BIA or Board) found that Manzoor had experienced past persecution in his native Pakistan on account of his political opinion, giving rise to a statutory presumption of a well-founded fear of future persecution. The burden then shifts to the Immigration and Naturalization Service (INS) to rebut that presumption. Here the BIA erred by imposing part of the INS's burden on the applicant. It did so by requiring Manzoor to establish that his well-founded fear of future persecution was country-wide after he had shown that he was persecuted in a particular region, possibly with some involvement by the federal government. Because of that legal error, we vacate the judgment of the BIA and remand for further proceedings.

## I.

We summarize Zeeshan Manzoor's testimony, which the BIA found credible. Manzoor is a 24-year-old native of Karachi, a city in the Sindh province of Pakistan. He is an ethnic Mohajir, a group defined as the native Urdu-speaking descendants of those who immigrated to Pakistan when India was partitioned in 1947-48.

Manzoor said that he is a member of the Mohajir Quami Movement (MQM). According to reports by the U.S. State Department and Amnesty International, the MQM was founded in 1984 by Mohajirs who felt disadvantaged in relation to native Sindhis. The same reports explain that a faction called the Haqiqi split off from the main MQM, now sometimes called the MQM(A), in the early 1990s. Both the State Department and Amnesty International say that relations between the Haqiqi and MQM(A) are tense and have led to political violence and killing.

Manzoor testified that Haqiqi workers kidnaped him in 1996 and again in October 1997 and that shots were fired at his father's house. Manzoor said that his family did not report these incidents to the Pakistani police because the police sometimes exchange information with the Haqiqi. After Manzoor escaped from the second kidnaping, his father arranged for him to leave Pakistan. Manzoor waited two months for a visa. He said he had to cancel his departure three times because the Pakistani police and immigration service had his name listed as an active MQM(A) member. In February 1998, he paid a bribe to facilitate his departure and left Pakistan. Manzoor traveled to Paris and the Dominican Republic. On February 17, 1998, the U.S. Coast Guard caught him trying to enter Puerto Rico illegally by boat.

After being caught, Manzoor told authorities that he would be killed by Haqiqi members or members of the Pakistan People's Party

if he were returned to Pakistan.  An asylum pre-screening officer interviewed Manzoor and determined that his testimony was sufficiently credible to warrant a hearing before an immigration judge.  Manzoor was also charged with being subject to removal from the United States under 8 U.S.C. § 118(a)(7)(A)(i)(I).[1]  At a hearing on July 22, 1998, Manzoor admitted the allegations against him, conceded removability, and requested asylum and withholding of removal.  The immigration judge found Manzoor removable as charged but granted him a continuance to allow him to submit an asylum application.  When Manzoor filed the application, the judge forwarded it to the State Department for an advisory opinion about conditions in Pakistan.

On October 22, 1998, after receiving the State Department's country profile of Pakistan, the judge held a hearing on the merits of Manzoor's asylum petition.  As recounted here, Manzoor testified about his membership in the MQM, the kidnapings, and his flight from Pakistan.  The judge asked Manzoor if he had considered moving to a different part of Pakistan. Manzoor said: "I could not go to another area . . . . Because you, require identity card and I don't have identity card, because if I go to Karachi by road, they have a check post, and because I speak Urdu, they'll [turn me] over to MQM Haqiqi, and they'll kill me."  When the judge asked him if he could travel by

---

[1] The statute forbids entry to the United States when an applicant for admission lacks a valid immigrant visa or entry document.  See 8 U.S.C. § 118(a)(7)(A)(i)(I).

-4-

airplane, Manzoor responded: "This is not possible . . . . Because on airport there is police and then there is MQM Haqiqi people all [over] airline station, so they'll get hold of us." The judge did not ask the INS any questions about whether the persecution of MQM members is limited to Sindh province.

In her oral decision of November 18, 1998, the judge denied Manzoor's request for asylum and withholding of removal. The judge said that Manzoor's testimony was "vague," "unpersuasive," not corroborated, and inconsistent with the State Department country profile. She found that Manzoor had not established persecution by the Pakistani government or by a faction that the government could not control. In addition, relying on the country profile of the State Department, the judge said that there were no credible reports of harassment and abuse of MQM members outside of Sindh province, and that Manzoor could therefore relocate to a different part of Pakistan.

Manzoor appealed to the BIA, which issued its opinion in the matter on July 10, 2000. The BIA said that the immigration judge "did not explicitly find the respondent's testimony not to be credible," and that it was thus "difficult to defer" to the judge's findings. The Board said that after reviewing the transcript of Manzoor's testimony, it could find no "support in the record for an adverse credibility finding." Instead, the Board found Manzoor's account to be "detailed and consistent," and said that his "testimony and supporting

documentation, especially regarding the political climate in Pakistan and the activities of the MQM vis-a-vis other political parties, are consistent with the country profile prepared by the Department of State." As a result, the BIA found Manzoor's testimony credible. The BIA also said that it "agree[d] with the respondent's contention on appeal that the Immigration Judge failed to fully consider the documentary evidence provided by the respondent." In light of Manzoor's testimony and supporting documentation, the BIA found that Manzoor "was persecuted on account of his political opinion" and stated that because Manzoor had "demonstrated past persecution, he is presumed to have a well-founded fear of future persecution."

Despite these findings, the BIA denied Manzoor's request for asylum and withholding of deportation on the ground that Manzoor failed to show that the threat of persecution existed country-wide. A majority of the panel found that "while the record clearly indicates that conditions in Karachi continue to be dangerous for members of the MQM, the record reflects that MQM members are able to live safely outside of the Sindh province." A dissenting board member took a different view of the evidence:

> The record indicates that the MQM-Haqiqi are in collusion with both the federal government and the military in Pakistan. This cooperative relationship, when coupled with the pervasive military and police presence throughout Pakistan, makes it unlikely that the respondent will be able to return to a different location

within Pakistan where he could successfully avoid future persecution.

## II.

Section 208(a) of the Immigration and Nationality Act authorizes the Attorney General, in his or her discretion, to grant asylum to an alien who is a "refugee." 8 U.S.C. § 1158(a); INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). The Act defines a refugee as an alien who cannot or does not want to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). We review the BIA's legal conclusions de novo, "with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Gailius v. INS, 147 F.3d 34, 43 (1st Cir. 1998).

"To qualify for asylum, the applicant must show that he actually fears persecution (a subjective issue), and that there is a 'reasonable possibility' that persecution would actually occur (an objective issue)."[2] Foroglou v. INS, 170 F.3d 68, 71 (1st Cir. 1999) (quoting Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992)). No

---

[2] To establish that he or she is entitled to withholding of deportation, an applicant must demonstrate a "clear probability of persecution." INS v. Stevic, 467 U.S. 407, 413 (1984). This standard "requires a more rigorous showing" than the standard for an asylum claim. Velasquez-Valencia v. INS, 244 F.3d 48, 50 n.1 (1st Cir. 2001).

greater showing is required.  See INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987) ("alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country").  We have observed before that "Congress has not defined the term 'persecution,' and the courts thus far have failed to achieve a general consensus on its meaning and scope in this context." Aquilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999).  However, we can say that while persecution is not restricted to "threats to life or freedom," it requires more than "mere harassment or annoyance." Id. at 570 (citing INS v. Stevic, 467 U.S. 407, 428 n.22 (1984); Balazoski v. INS, 932 F.2d 638, 642 (7th Cir. 1991)).  Courts make case-by-case determinations of what constitutes a well-founded fear of persecution within these "broad margins."  Id.

In this case, the BIA determined that Manzoor had suffered past persecution on account of his political opinion.  The Board based this conclusion on Manzoor's testimony that the Haqiqi twice kidnaped him because of his affiliation with MQM(A), and on the support for Manzoor's description of the tension between the Haqiqi and MQM(A) in the State Department country profile.  A "finding of past persecution triggers a regulatory presumption that the applicant has a well-founded fear of future persecution, provisionally establishing the applicant's refugee status and eligibility for asylum." Fergiste v. INS, 138 F.3d 14, 18 (1st Cir. 1998) (citing 8 C.F.R. 208.13(b)(1)(i) (1997)).

-8-

The BIA recognized this principle.  However, the Board then said that "[a]n alien seeking to meet the definition of refugee must have more than a well-founded fear of persecution in a particular place within a country . . . rather he must show that the threat of persecution exists country-wide."  The Board thus placed an additional burden on Manzoor to show that his fear was based on a threat of country-wide persecution.  After considering the applicant's testimony and documentation and the State Department country profile, the Board concluded that "the conditions in Pakistan, on a country-wide basis, are not such that the respondent would have a well-founded fear of returning there."

In support of its burden-of-proof allocation, the BIA cited In Re C-A-L, 21 I. & N. Dec. 754 (BIA 1997).  In that case, the BIA denied an asylum claim because, among other things, the applicant "ha[d] not provided any convincing evidence to suggest that his fear of persecution would exist throughout Guatemala." C-A-L, 21 I. & N. 754. There are also other cases in which the Board has said that the applicant has the burden of proof to show that his or her fear of persecution is country-wide.[3]  See Matter of R, 20 I. & N. Dec. 621,

_____

[3]  We note, however, that the facts in these cases are distinguishable from the case at hand.  In C-A-L, for example, the asylum applicant was a Guatemalan soldier who had been captured by guerrillas.  The BIA found that the applicant's "problems were confined to his hometown" on the basis of a State Department report that said that the guerrillas were "concentrated in remote areas with large Indian populations."  21 I. & N. Dec. 754.  According to Manzoor's

625 (BIA 1992); Matter of Acosta, 19 I. & N. Dec. 211, 235 (BIA 1985) ("an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country--he must show that the threat of persecution exists for him country-wide").

The BIA is correct that the applicant has the burden of proof to show that he is a refugee. See 8 C.F.R. § 208.13(a) (1997); Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992). But nothing in the regulations that were in place when the BIA denied Manzoor's claims supports the Board's determination that an applicant who has established a well-founded fear of persecution must go on to prove that the threat of persecution is country-wide. Instead, the regulations provide that if an applicant suffered past persecution, then he or she is presumed

> also to have a well-founded fear of future persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.

8 C.F.R. § 208.13(b)(1)(i) (1997). The burden then is on the INS to rebut the presumption by a preponderance of the evidence. In our view this includes the burden on the INS to show that the applicant could

_____

evidence, the Haqiqi were not rebels but rather operated with government support.

reasonably avoid persecution by relocating to another part of the country. While we think that was the plain import of the law at the time of the applicant's hearing, a recent amendment to the regulations appears to explicitly allocate the burden of proof to the INS.[4] In addition, two circuits have already made this point when the applicant showed that the past persecution was by the government of the country. See Singh v. Ilchert, 63 F.3d 1501, 1510 (9th Cir. 1995); Abdel-Masieh v. INS, 73 F.3d 579, 587 (5th Cir. 1996).

While the BIA's interpretation of the regulations is entitled to "appropriate deference," Gailius, 147 F.3d at 43, that deference cannot save an interpretation that is at odds with "unambiguous provisions that permit of no conflicting interpretations." Ilchert, 63 F.3d at 1510. The INS cannot impose an evidentiary burden on the applicant that is not provided by and appears to be inconsistent with the statute or regulation. We thus find that the BIA erred in allocating the burden of proof to Manzoor to show that the threat of persecution was country-wide. Under the regulations that were in place when the BIA ruled, once an alien has shown that he has a well-founded

_____

[4] The new regulations state: "In cases in which an applicant has demonstrated past persecution . . . the Service shall bear the burden of establishing by a preponderance of the evidence" that "[a]n applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(ii) and (b)(2)(ii) (2000).

fear of persecution in his home country, the INS has the burden to prove by a preponderance of the evidence that the threat is limited to a particular region.

In this case, the INS submitted no evidence in support of the claim that Manzoor's fear of the Haqiqi was based only on a threat of persecution in Sindh province. Instead, the BIA relied on the State Department country profile obtained by the immigration judge, which said that "resettlement outside Sindh province is a viable alternative for most MQM members except for those facing serious charges and where enforcement of the arrest warrant is more likely." The Board found the State Department's conclusion about the viability of resettlement to be "uncontradicted by the respondent's testimony and documentation." Citing its own precedent, Matter of T-M-B, 21 I. & N. Dec. 775, 779 (BIA 1997), the Board said the State Department opinion was owed "'considerable deference' in the absence of contradictory evidence." We have said, however, that "the advice of the State Department is not binding, either on the service or on the courts." Gailius, 147 F.3d at 46 (quoting Gramatikov v. INS, 128 F.3d 619, 620 (7th Cir. 1997)). "This is both because it is the Attorney General, not the Secretary of State, whom Congress has entrusted with the authority to grant asylum and because 'there is perennial concern that the [State] Department softpedals human rights violations by countries that the United States wants to have good relations with.'" Id. (quoting Gramatikov, 128 F.3d

at 620); see also Hengan v. INS, 79 F.3d 60, 62-63 (7th Cir. 1996)(immigration officials may give greater weight to the views of human rights organizations than to the State Department).

Moreover, contrary to the Board's conclusion, Manzoor presented evidence contrary to the State Department country profile on the possibility of persecution outside Sindh province. True, the Amnesty International reports focus on Sindh province in describing political conflict involving the MQM. But Amnesty International also notes that "[d]eaths in custody and extrajudicial killings are reported from other parts of the country as well." While there is no explicit reference to killings of MQM members outside Sindh, it is clear from the text as a whole that the report focuses on Sindh because "nowhere have deliberate and arbitrary killings reached as massive a scale as in Karachi" rather than because Amnesty International has ruled out the possibility that MQM members face persecution in other parts of Pakistan. The proper allocation of the burden of proof on the country-wide issue is particularly important when there is contradictory or ambiguous evidence about it.

Also, both Amnesty International and the State Department describe government involvement in the political conflict that has led to the deaths of MQM members. Indeed, as the dissenting panel member recognized, Amnesty International cites collaboration between the government and the Haqiqi that includes federal government officials

as well as local and provincial officials in Sindh.[5] Before us, the INS contends that the collaboration between the Haqiqi and the government is limited to Sindh province. That is not clear from the record, however, and the issue can be explored on remand. In addition, although we do not decide the issue, we note that the Fifth and Ninth Circuits, as well as the BIA on one occasion, have found that evidence of such government involvement in the persecution of a political group weighs heavily against the conclusion that an alien's demonstrated well-founded fear of persecution is not country-wide.[6]

**III**

---

[5] The 1998 Amnesty International report states: "According to many commentators in Pakistan, [the Haqiqi] faction was supported by successive federal governments and the military to weaken the main MQM." The 1996 report states: "The ongoing conflict in Karachi has involved mainly two factions of the . . . MQM . . . [and] the federal and the provincial governments of different complexions."

[6] See Abdel-Masieh, 73 F.3d at 587 ("that an alien . . . might be safe from persecution by the national government in other areas of the nation . . . does not suffice to show that the alien lacks the requisite fear of persecution"); Ilchert, 63 F.3d at 1511 ("This court presumes that in a case of persecution by a governmental body such as a national police force, the government has the ability to persecute the applicant throughout the country."); Singh v. Moschorak, 53 F.3d 1031, 1034 (9th Cir. 1995) ("It has never been thought that there are safe places within a nation when it is the nation's government that has engaged in the acts of punishing opinion that have driven the victim to leave the country."); In Re Kasinga, 21 I. & N. Dec. 357 (BIA 1996) (finding applicant's fear of persecution to be country-wide in part because the Togo police tolerate violence against women and the government has a poor human rights record).

- 14 -

For the reasons stated, the order of the BIA is vacated, and the case is remanded to the BIA for further proceedings consistent with this opinion.[7]

---

[7] Because of our disposition of Manzoor's asylum claim, we do not reach Manzoor's appeal of the denial of withholding of deportation. <u>Gailius</u>, 147 F.3d at 47 n.9.